I would like to request, I guess, three minutes in rebuttal? Sure. All right. If it pleases the Court, I've been on this case for a long time. Just by way of perspective, and I don't want to spend too much time on it, I handled this case. It had to be reversed in the district court. Judge made the same mistake, not dealing with the Asperger's issues, evaluated by Dr. Canters. The appeals counsel then reversed it a second time and came back to Judge Adams, who sees this case, and reassert that the ALJ decision is perforated with instances in which it simply either overlooks things or mischaracterizes things. In terms of perspective, I would like to point out, if you look at Pelham's opening brief, I think at page 45, it was footnote 32, we outlined earnings. This gentleman has earnings. They drop to $4,100 in 2009, they go up, and then there's three years, from 2011 to 2013, which was zero, and then in 2014, he makes under SGA, and doesn't see SGA until 2015. The primary focus of the ALJ's decision was that if he worked before and he worked later, then he must be capable of work. Now, I realize that, but only during the periods when one has earnings at over SGA can someone be disqualified from benefits, regardless of whether or not there is still presence of severe impairments that interfere with your ability to work. How did the ALJ deal with, and to me, this appears to be a fact from the record, if it's not, please correct me, that his most sustained, your client's most sustained period of employment was working in his father's restaurant? One has to understand the nature of that. The record shows that he was taking three-hour breaks. He couldn't follow instructions. He couldn't do the work as a dishwasher. His mother, who was discounted for reasons... You may be misapprehending my question. Okay. How did the ALJ, did the ALJ characterize his work at the father's restaurant as continuous? He was employed there for a period of time. I don't remember whether he said continuous, but he would have misapprehended his success at that job. And I may not be understanding... I once worked in my father's business, and he would never fire me. However bad I was at filling up gas tanks, checking the oil, or the water in the radiator, I was his son, and he thought I was doing the best. But I don't think anybody would look at that period of employment and say, Hawkins gainfully employed that entire period of time without taking into consideration that I was working for my own father. Now, having heard that, how did the ALJ deal with that? In terms of that continuity? Not the continuity. The fact that he was working for someone that logic suggests would not fire him, however bad his performance was, however his impairments, such as they may be, might have affected his performance. Your Honor, I think I'm at a loss because I don't think the ALJ addressed that. I think he overlooked it. That's my precise question. Okay. And you know sometimes when the court asks questions, they may be trying to help you. Okay, thank you. Could you address what the regulations say? How did the regulations define substantial gainful activity? Oh, how do they sustain it? It is, I think I quoted it, and to paraphrase, it's basically the capacity to engage in work in a productive and consistent manner. Does it say that in the regulations? I'm just looking at them now. It says it involves doing significant physical or mental activities. Your work may be substantial even if it's done on a part-time basis. Gainful is work you do for pay or profit. It doesn't have anything beyond that in the regulations. So, where are you getting these other factors? The vocational expert testimony has always consistently dealt with whether or not there are off-task behaviors. And I know I've cited to it, but the work needs to be consistent and performative. And where is that from? Because the only case I saw was GATLIFT that put in the ability to hold the job for a significant period of time, which is not in the regulations. But in GATLIFT, the work only lasted two months, which is not the case here. So, I was looking for the basis for all of these additional requirements that you were indicating, and maybe you could tell me where they're from. And I apologize, I can't find that at the moment, but I recall that in the briefing that there was an explanation and definition of the SGA, which required this degree of set. Ultimately, it evolves, and usually from the vocational testimony, that a person is unemployable, which is at least a corollary, if the person cannot perform, basically, and it varies between 85 to 90%, depending on, I've never heard any numbers other than that, at the rate during the working hours of the workday of unimpaired individuals. And so, the SGA has been defined by testimony, it was explained by the vocational expert in this particular case, that if he had time off as a result of off-task behaviors, I don't mean a day off or a week off, but periods of time during the day. You seem to be discussing a different question, the question whether the claimant would be able to perform jobs in the national economy. I understand that. If the PRFP was sufficient. That's different than the SGA determination. Well, I think it's cited, and I apologize that I can't go, and I was reading it yesterday and this morning, and to my understanding, it does imply the need for consistency in performance. Okay. This individual has always been a little bit off. You know, like he had difficulties in school, he had his continuity, the judge discounted... He's on the spectrum, right? He's on the spectrum, but he is... Is there any dispute about that in the record? No, I don't see any dispute. I think the judge looks at his working and earning before and after, and not the degree of struggle, which shows that the period when he didn't work, when he was fully incapable of working, and I would like to point out that the regulations talk about... In dealing with SGA, I expressed a framework in which one must contemplate, I believe, that a person should be considered incapable of work if there's a severe impairment when they're not reaching SGA. There's no presumption, there's no assumption, but to stand the rule on its head that we only conclude that regardless of degree of impairment, person is not entitled to benefits when they exceed SGA, which can be reduced by IRWE or by work performance, and the concept of a subsidy is wrong. Is the only SGA the work in the father's restaurant? No, he's got a long history of SGA, but in those years... No, I'm talking about in the period of dispute. I think that's right, I think the only SGA in the period of dispute is when he's working for dad. But there's also an empty period altogether, and then there's $7,700, and I think it's 2014, and then 2015 jumps quite a bit, which actually, and I don't mean to cut off your Honour's direction, it raises another issue. I realize this is just a hole in the donut in terms of his having had earnings before and after, and his later struggles are not before the court, not of the framework, but that the issue of the trial work period becomes highly relevant because the Commissioner has argued that one must be adjudicated to be entitled to move forward for a trial work period, and I'm saying that as we move into 2015, when he's working, he's entitled to a trial work period once he's been adjudicated to be disabled. One does not have to be previously disabled before they can commence a trial work period. That's not what the regulation says. And what I'm looking for is a window for this gentleman, because our job as counsel is... Can I come back to this in a different way? It seemed to me that the ALJ denies benefits on the ground that he had SGA during the period he was working at the father's restaurant. Am I misunderstanding what the... If it's 2015 he had it, 2014... Am I misunderstanding what the ALJ did? I think, because we had empty years. There's no... It's the money doesn't begin... Oh, SGA... He was under SGA in 2014. He doesn't reach into 2015, and I'm sorry that I can't remember... It's listed in the D document, and I didn't look at it specifically, because it would show, based on the IRS reports, where he was working. But I still have a difficulty with the fact that there were so many reports that were credible and then discounted for no legitimate reason regarding the issues. His father was programming him for only as many hours as he could sustain himself. His mother... Well, what I'm after is a follow-on, basically to Judge Hawkins' set of questions. Working for his father was, in effect, a protected workshop. Dad was giving him breaks that he would never have given to an ordinary employee, which is to say that if there's a reliance on the work for the father, saying, well, that was substantial gainful activity, I disagree, because of the nature of the employment for the father. Oh, it's not SGA if it's essentially subsidized. That's the point, of course. Okay. You're down to three minutes. Would you like to save it for rebuttal? I'll save it. Thank you. Thank you very much, Counsel. We'll hear from the Attorney General at this time. Would you raise the screen so we can see Ms. Moome? There we go.  Good morning, Your Honors. May it please the Court, Sarah Moome on behalf of the Commissioner of the Social Security Administration. So Plaintiff Appellant Casey Vela alleges a closed period of disability between October 2010 and December 2016 due to longstanding impairments of ADHD, mood disorder, and Asperger's or autism disorder. But despite these longstanding impairments, Vela worked at substantial gainful activity both before and after the closed period of disability. Now, moving away for a moment from his work during the relevant period from October 2010 to December 2016, Vela worked at substantial gainful activity levels both before and after. Now, Vela contends that the mere fact that he worked before and after this closed period of disability doesn't reflect on whether or not he was disabled during that period. And in abstract, divorced from the context of this case, that is true. There are circumstances where someone has an acute injury, for example, that requires a lengthy period of recovery or an exacerbation of existing longstanding impairments that would eliminate the ability to work for a period of time. But in this case, the medical record doesn't evidence that. To the contrary, the medical record evidences that Vela's mood disorder during this period was stable and well-controlled on his medication. Even when he stopped taking his medication, he reported in May 2013, he didn't report any additional symptomology and he didn't treat through the remaining period. When he initiated treatment again after the relevant period in 2017 at his intake examination in September 2017, he had completely normal findings, normal cognition, normal mood, normal affect, normal attention, normal concentration. So the medical record provides substantial evidence, both via Vela's own reports to his symptom or to his providers about his symptoms and his providers observations of his presentation that he was not undergoing some kind of exacerbation of his longstanding impairments that did not prevent him from working before the relevant period and did not prevent him from working after the relevant. During the relevant. Now, let's go to. Can I ask a question? Sorry, it's a little hard for you to hear. During the relevant period, did he have substantial gainful employment? Yes, so the ALJ found that he had substantial gainful employment. And what was that employment? That employment was as a dishwasher at Nourish. He also worked as a coach. That's to say when he's working at his father's restaurant. Was there other substantial gainful employment during that period? There was not. He also worked as a tow truck driver, but the earnings reported did not arrive. They were just like. Right, and what was the manner of the work when he was doing the tow truck work? Was he able to work alone? Did he always have to have somebody with him? There was a letter from his employer that said he consistently needed to work with someone else and that valued his work at about $250 a week, which is just below the substantial gainful activity threshold. He was really, at least if we believe the testimony, he was really incapable of performing that work on his own. Right, and that is actually consistent with what the ALJ found. The ALJ ultimately found that Vella's ability to work as a dishwasher, for example, or as a tow truck driver was more demanding than what Vella was capable of and therefore assessed a more restrictive RFC, limiting him to only unskilled work with very limited social abilities. Notably, the RFC that the ALJ assessed. What do we do with the evidence that during this relevant period, not only was he limited in terms of what he could do, like he had to take the long breaks and so on, he was subject to outbursts, temper and so on, that would get him basically canned. So the ALJ found that testimony to be unreliable and discounted it. The testimony came from both his mother and himself. And the ALJ discounted Vella's testimony because his subjective reports to his providers did not indicate that level of symptomology because the provider's observations of him did not indicate that level of symptomology because when he was reporting that he was working during the relevant period, he did not report that level of symptomology. And because when he initiated treatment after the relevant period, he presented normally. Did the ALJ- And so the reports from himself and his mother that he was unable to sustain work without it being in some way subsidized or sheltered, I apologize. I'm sorry, I didn't want to interrupt you. Did the ALJ find that the claimant's testimony with regard to his employment history was inconsistent? In other words, what he described, what the individual described about his employment history, did the ALJ find that one was inconsistent with the other? Answer's yes, isn't it? Yes. Okay. Yes. How do we square that up against the apparent fact that he was basically fired from every job other than with his father for behavior entirely consistent with his medical condition? So assuming that he was fired from every job as a result of symptoms from his impairments, that still does not mean he is disabled. Disability is the inability to engage in any substantial gainful activity because of your impairments. Vella has worked at substantial gainful activity levels. Let me rephrase- Notwithstanding his long- Permit me to rephrase it and see if we can clear it up. It's apparent the ALJ discounted the claimant's testimony, Mr. Vella's testimony about his employment history about the effect on his employment history, that it was inconsistent with the fact that he had worked and had various jobs, et cetera. I'm trying to square that up against the fact, the apparent fact from the record that other than washing dishes in his father's restaurant, he was basically fired from every job he ever had because of his behavior, behavior which was consistent with his condition. What do we make of that? Right, so to answer your question, let me make sure I understand the premise. If we assume that he was fired from every job, then what? Is that right? Yes. Am I misunderstanding? I guess what I want to say is that if we presume he was fired from every job consistent with what he has testified, that still doesn't mean he is disabled. Even as his behavior ultimately led to his termination, he still was able to work at substantial gangle activity levels. In fact, he worked at Wilder Auto from 2017 to 2019, so for a period of approximately two years, earning substantial gangle activity. And so it may be, even if we assume that he was fired from his jobs because of his behavior, there's no requirement under, the question of disability isn't whether you can keep a job for extended periods of time for five, 10 years. The question is, can you engage in substantial gangle activity? And here, demonstrably, he can. He worked again at Wilder Auto just after the relevant period for two years. He had a number of jobs before where he worked them from one to two years at substantial gangle activity levels. So notwithstanding his longstanding impairments that may have caused behavioral difficulties, that may have caused difficulty with attention and concentration, that may have ultimately resulted in the loss of his jobs, that still doesn't mean he is disabled because he is able to earn substantial gangle activity levels. Does that get to your question? Let me ask a variation on that question. I take it as a premise for the question that before and after the relevant period, he was able to engage in work and not get fired. But during the period, he's not able to do so. And let's assume that, and I think this is probably going to be borne out by the facts, the problem in that intervening period, let's say the period in question here is, he has not had the proper therapy, he's not had the proper meds, there's just something that he hasn't quite figured out or the treatment providers haven't figured out how to do it. Does that mean that merely because they figure out how to make him employable later, that he was employable earlier during the relevant period? It does not. But again, in the context of this case, the evidence doesn't show that he underwent significant psychiatric or medical treatment that enabled him to work. In fact, he didn't initiate treatment until September 2017, but he began working at the beginning of 2017. Dr. Peterson, one of the examining psychologists said that Vella was much too impaired to work and would need intensive psychiatric care and vocational rehab to become employable. He didn't receive that, yet he began working at Wilder Auto in 2017. And before the relevant period, there isn't any evidence that he had significant vocational rehabilitation or intensive psychiatric care that was any different than the care he was receiving during the relevant period, and yet he was still able to work. So I agree, Your Honor, that there are some circumstances under which we would say that it was necessary for someone to have more intensive treatment in order to be able to work, but that's just not what happened here. In fact, he didn't treat at all during the relevant period, and when he re-entered treatment, his findings were completely normal. I don't see- Unless there are any further questions. I don't see any from my colleagues. Thank you very much for your argument and your brief. And we'll now hear rebuttal argument for Mr. Grad. Thank you. Thank you, Your Honor. It's troubling to think that the evaluation of this case should turn on an impaired individual's ability to earn income at various periods because he was so persevering in trying to go to work, which generally from a position of logic would show this is not a person trying to gold-brick, as the expression used to be. The judge spent a lot of time trying to discount the psychiatric evidence and the commissioner has questioned, at least to put this in perspective, what Dr. Cantor says. But the parents, even though she said, I did it because he came in to deal with his appeal. Dealing with these other periods, it's important to understand that he explained and the parents explained, at least the mother, that they took him there because they were so exasperated and didn't know what else to do. And from the equation with respect to treating, because this is a 2012 and a pre-2017 case, Cantor's is actually a treating doctor because she spends the time that would be appropriate. She takes a family history. She meets with him. She does biometrics, she does some testing that is objective and not just based on symptoms. And so now, for an individual who has shown a lifetime of conflict in jobs, he was fired, I think it was from Walmart, because it would take him two hours to assemble a bicycle. Others would take 45 minutes. He'd get distracted. He couldn't stand doing the work. He'd wander off. They told him, don't do service calls. He was doing an Office Depot job. They told him he had a cell, some kind of it. It's an Office Depot card. And he wound up faking that, which got him into trouble, because he couldn't keep up with the ordinary workflow that unimpaired workers would have. And the mere fact that he struggles, he does not shed his status of having severe impairments even when he's able to earn money. And the history throughout this period before and after is overshadowed by how many failures, as you recognize, he had. And that the discount of the mother and the discount of the doctor and the attempt to use CEs, which actually it said no MER, I think, in the record, but they had two medical reviewers who claimed to look at something else, gave no explanation. And we are still left in this case with the hierarchy of medical evidence, which is so persuasive. And it is so corroborated by the degree of difficulty this gentleman had that it- If you don't have another question, I think I've gotten to the majority of my points as I watched the last 30 seconds tick down. But I think it's clear that the medical evidence is really uncontradicted and corroborated by either Peninsula or Dungeness and who absorb and accept that. So I find that most of the arguments, and I don't want to be ad hominem, are somewhat disingenuous in terms of the spin on the statutes or the cases. Thank you so much. Thank you. Thank you for your argument. Thank both counsel for their arguments and their briefs. The case just argued will be submitted for decision.
judges: HAWKINS, FLETCHER, IKUTA